844 So.2d 380 (2003)
HAZELWOOD FARM, INC.
v.
LIBERTY OIL AND GAS CORPORATION, et al.
No. 02-266.
Court of Appeal of Louisiana, Third Circuit.
April 2, 2003.
Rehearing Denied May 7, 2003.
*383 James Paul Doherty Jr., Andrus & Doherty, Opelousas, LA, Harry T. Lemmon, Gladstone N. Jones, III, Peter N. Frieberg, Jones, Verrs & Freiberg, Stuart H. Smith, Jack W. Harang, Smith & Harang, New Orleans, LA, for Plaintiff/Appellee/Cross Appellant: Hazelwood Farm, Inc.
Stephen C. Carleton, Scott E. Mercer, Henry D.H. Olinde, Jr., Simoneaux, Carleton, Dunlap & Olinde, L.L.C., Baton Rouge, LA, for Defendant/Appellant: Chevron U.S.A., Inc.
Court composed of NED E. DOUCET, Jr., Chief Judge, MICHAEL G. SULLIVAN and GLENN B. GREMILLION, Judges.
DOUCET, Chief Judge.
Defendant, Chevron U.S.A., Inc. (Chevron), appeals a judgment of the district court awarding Plaintiff, Hazelwood Farm, Inc. (Hazelwood), $2,000,000, for damages to Hazelwood's property occasioned by Chevron's breach of contract. Although the judgment was based on a jury verdict, all of Chevron's assignments of error are addressed to rulings of the court. These rulings are said to be erroneous because they (1) allowed Hazelwood to recover for breach of contract, (2) awarded damages which occurred before Hazelwood acquired the land, (3) gave an award that was more than the property was worth, (4) rejected pleas of prescription, and (5) failed to find Hazelwood had judicially confessed adverse facts. Hazelwood cross-appeals alleging the trial court erred (1) in not letting its claim for punitive damages go to the jury, (2) in setting the expert witnesses' fees too low, and (3) in denying a request by Hazelwood for some items of discovery, resulting in Hazelwood's inability to meaningfully cross-examine some opposing witnesses thereby resulting in the award of inadequate restoration damages. After a recitation of the basic facts, we will address each of these eight assignments of error.
FACTS
Hazelwood, a corporation, owns a 686 acre tract of farmland near Port Barre in St. Landry Parish. It acquired title to the property in 1991, but the land has been in the Edmundson family (the owners of the corporation) since 1968. Ernest E. Edmundson, Jr., bought the property in 1968 from John E. Wells. John Wells reserved the minerals. Hazelwood has no mineral interest in the property.
On August 10, 1926, the 686 acres was leased by the then owner, Wilson & Cochran, to J.B. Ferguson for oil and gas exploration. The parties maintained the right to assign the lease and provided that the lease provisions would be binding on the parties' successors and assigns. Mr. Ferguson *384 assigned the lease three days later to Gulf Refining Company (Gulf).
The lease further provided: "The use of the surface of the land is granted only for the purpose hereof. Grantee [Ferguson and assigns] shall be responsible for all damages caused by his operations."
The lessee's rights under the 1926 lease were subsequently assigned, either wholly or partially, to others, including Chevron. Chevron became the successor to Gulf when they merged in 1985. Oil and gas operations under the lease began shortly after the 1926 lease date and were still going on at the time of trial.
Gulf conducted oil and gas operations on the property from 1926 until 1956. When it assigned the mineral lease to another in 1956, it retained ownership of 25% of the oil produced. Pursuant to two underground storage leases, Gulf had also constructed an underground natural gas storage cavern beneath the property. Gulf assigned the underground storage lease rights to Warren Petroleum Corporation (Warren) in 1958, but then acquired Warren in 1971, along with the underground storage lease rights. In 1972 it assigned these rights again.
No one has ever lived on the property. About two-thirds of it is in cultivation. During the seventeen years before the suit was filed while the Edmundson family owned it, either individually or through an estate or through a corporation, local tenant farmers raised rice and soybeans on the 400 and some-odd acres in cultivation. There is an irrigation well on the property.
In 1997 Hazelwood brought this lawsuit, asserting causes of action in both contract and tort and alleging that activities on the property by the mineral lessees caused environmental contamination to the surface and under the surface. The alleged activities included the construction of certain pits, including a 12-acre evaporation pond[1] into which were dumped oil, grease, salt water, and other hazardous and/or toxic oil production wastes. As a result, Hazelwood claimed that the property had become contaminated with radioactive materials and that the water in the aquifers was polluted.
Hazelwood sued several entities along with Gulf and Chevron. Before trial Hazelwood settled its claims against all defendants except Gulf/Chevron and dismissed those defendants. As stated earlier, Chevron is the successor to Gulf. The real defendant is Chevron, but we will refer to it as Gulf/Chevron, the designation used during the trial and in the briefs. The case went to trial against Gulf/Chevron alone.
The trial took three weeks. Of the twenty-five witnesses who testified sixteen were qualified as experts. Eight expert witnesses testified for Hazelwood and six experts testified for Gulf/Chevron, then two additional experts testified for Hazelwood in rebuttal. Hazelwood's experts in its case in chief were two petroleum engineers, a health physicist, an agronomist, a hydrogeologist, an expert in radiation protection and remediation, a natural gas consultant, and a witness who had expertise in plugging and abandoning old wells. Gulf/Chevron's defense experts were a real estate appraiser, a petroleum engineer, an agronomist, a soil scientist, a medical doctor, and a hydrogeologist. Hazelwood's rebuttal experts were a toxicologist, and a witness who had expertise in chemistry, *385 petroleum engineering, occupational safety and health.
There were nine fact witnesses. They included Robert D. Edmundson, whose family owned Hazelwood, two tenant farmers of the land, and Richard Brackin, a representative of the Louisiana Department of Environmental Quality (DEQ).
Some, but not all of the experts, went on the property and gathered eyewitness information and scientific test results which they used in their opinions. The parties engaged in considerable pretrial discovery; many experts who testified were armed with knowledge of the opinions of their counterparts on the other side, with the result that a number of experts spent a lot of time defending their own and challenging their opponent's views. Of the thousands of pages of trial testimony, a substantial part dealt with radioactivity, and the rest focused on oil and gas operations and environmental pollution, especially water pollution. Except for a few pages that dealt with mundane subjects that a jury might find familiar, such as growing rice, farming soybeans, or drilling water wells, most of the trial took the jury into unfamiliar scientific territory. The case was thoroughly tried.
The jury rendered a verdict in the form of responses to eighteen written interrogatories. As to Hazelwood's contract claim, the jury found that Gulf/Chevron breached the 1926 Oil & Gas Lease Contract and that this breach damaged Hazelwood's property. Moreover, the jury found that the Defendant acted in bad faith and that $2,000,000 would fairly compensate Hazelwood for the property damage due to the breach of contract.
Answering interrogatories having to do with the negligence/strict liability claim, the jury found that Gulf/Chevron was both negligent and strictly liable for its operations on the property, that its conduct caused damages to the property, that others were at fault as well, and that the proportionate fault between Gulf/Chevron and "others" was 40/60. The jury then answered a question asking for the value of the Hazelwood Farm property by inserting the amount of $304,000.
Question Number 16 asked the jury to indicate whether, if it awarded restoration damages, it found there was a reason personal to Hazelwood Farms for restoring the property to its original condition or whether there was reason to believe Hazelwood Farm would, in fact, restore its property. To these two inquiries the jury checked "No".
Finally, answering the last two questions on the verdict form, the jury awarded Hazelwood Farm $2,000,000 as fair compensation for restoring the property and $303,600 as fair compensation "[e]xclusive of any restoration costs, and not exceeding the value of the property...."
Before the case went to the jury, the trial judge had instructed counsel that although the jury would be queried regarding both the contract and tort actions, if Hazelwood got a favorable verdict for both, it would have to select one. Hazelwood opted for the verdict for its contract claim. The trial judge accordingly rendered a judgment for $2,000,000, with interest from judicial demand, and costs. The costs included expert witness fees for ten of plaintiff's experts totalling $11,650.
For reasons which follow, we affirm the judgment in every respect. We will address each assignment of error, beginning with those of the First Appellant, Gulf/Chevron. As we do so, we will expand on the facts of the case, as revealed by the testimony and exhibits, where the context requires.

*386 GULF/CHEVRON'S ASSIGNMENT OF ERROR NO. 1

By this assignment, the Defendant claims it was error to submit the breach of the original Wilson-Cochran Lease to the jury. The Defendant claims that it did not breach this lease as a matter of law because it had no contractual liability to Hazelwood. For the following reasons, we find no merit to this assignment.
This case was before this court on an earlier appeal in 2001. Hazelwood Farm, Inc. v. Liberty Oil and Gas Corp., 01-0345 (La.App. 3 Cir. 6/20/01), 790 So.2d 93, writ denied, 01-2115 (La.7/26/01); 794 So.2d 834. On that appeal we found that "the Wilson & Cochran Lease created a stipulation pour autrui in favor of Hazelwood, as surface owner," and remanded the case for a trial on the merits. We said:
The Wilson & Cochran Lease provides that "Grantee shall be responsible for all damages caused by his operations." Thus, we conclude that this language must be interpreted as providing a stipulation pour autrui in favor of Hazelwood. The fact that Hazelwood was not specifically named as a third party beneficiary in the mineral lease is of no consequence. Our jurisprudence recognizes that stipulations may be made in favor of undetermined persons.... In addition, the law does not require express acceptance or consent on the part of the beneficiary nor does it require a particular form of acceptance or consent.... [W]e find that the Wilson & Cochran Lease created a stipulation pour autrui in favor of Hazelwood, as surface owner.... [citations omitted]
Id. at p. 12, 790 So.2d at 101.
We regard this ruling as the law of the case. The law of the case doctrine operates to avoid re-litigation of the same issue, promotes consistency of results in the same litigation, and fosters fairness by affording parties one single opportunity to argue the issue and have it decided. West v. G & H Seed Co., 01-1453 (La.App. 3 Cir. 8/28/02); 832 So.2d 274. The doctrine operates to prevent the appellate court from reconsidering its own rulings of law on a subsequent appeal in the same case. Bowie v. Young, 01-0715 (La.App. 3 Cir. 3/20/02); 813 So.2d 562, writ denied, 02-1079 (La.6/21/02); 819 So.2d 335. The doctrine is flexible, and we are allowed to deviate from it in cases where it would cause an obvious injustice or where the earlier appellate decision was clearly erroneous. Id.
The evidence produced at trial on remand was the same, though in greater detail, as the summary judgment evidence on which we based our earlier ruling. Our earlier ruling was not clearly erroneous. Under these circumstances, invoking the law of the case rule, we will not revisit our earlier decision. Hazelwood, as the beneficiary of a stipulation pour autrui, has the right to sue Gulf/Chevron in contract. La. Civ.Code art.1981.

GULF/CHEVRON'S ASSIGNMENT OF ERROR NO. 2
Gulf/Chevron's second assignment argues that, because Hazelwood did not acquire the property until 1991 and the damages it seeks to recover occurred before that time, Hazelwood was not the owner when the damages occurred and cannot recover. It relies on the rule that a purchaser of immovable property acquires no right to recover from the lessee for property damage sustained before the sale, in the absence of a specific assignment of that right. It cites Prados v. South Central Bell Telephone Co., 329 So.2d 744 (La.1975), and other cases for this rule. The Prados decision held that the right to damages conferred by a lease was a personal right, not a property right, and as a *387 personal right/obligation, it did not pass to the new owners of the land because there was no specific conveyance of it in the instrument of sale.
In our present case, there was no specific conveyance of the right to damages in the 1991 instrument of exchange by which Hazelwood acquired the property subject to this old mineral lease. Therefore, Hazelwood did not acquire its right to claim damages by assignment in the act of conveyance. Hazelwood is nevertheless the owner of the right to claim damages in its capacity as a third party beneficiary.
We have already held that the law of this case is that the Wilson & Cochran Lease created a stipulation pour autrui in favor of Hazelwood as surface owner. We recognize that by definition a stipulation pour autrui establishes a benefit in favor of a person and not an estate. La.Civ. Code art.1978. However, it is in the nature of a stipulation pour autrui that a third person, in this case Hazelwood, derives a benefit from a contract made by others. That benefit in this case is the right to claim against the mineral lessee damages to the property caused by the lessee's operations. The jury found that Hazelwood, as the current owner, has suffered damages. The fact that Hazelwood was not named in the stipulation is of no moment. Andrepont v. Acadia Drilling Co., 255 La. 347, 231 So.2d 347 (La.1969). Hazelwood acquired its right to sue for damages not by its 1991 contract of exchange, whereby it acquired title to the property, but by virtue of its status as owner of the land and by virtue of the 1926 oil and gas lease contract. In other words, it acquired its right to sue for damages by virtue of a stipulation pour autrui which made it a third party beneficiary of a contract made by others.
Our disposition of this assignment is further supported by language found in Magnolia Coal Terminal v. Phillips Oil Co., 576 So.2d 475 (La.1991). In that case, the 1985 owner of property filed suit to recover damages for the mineral lessee's continuing breach of its contractual obligations which began twenty-one years earlier when the property was owned by a different person. The Supreme Court said: "Magnolia's right to recover damages is a property right arising out of the original lease and attached to the property." In support of this observation the Supreme Court cited Andrepont, 255 La. 347, 231 So.2d 347. In Andrepont, after a farmer was granted a verbal lease to farm soybeans, the owners of the farm executed an oil and gas lease which provided that the oil and gas lessee was responsible for all damages caused by its operations. The Supreme Court held that that was a stipulation pour autrui in favor of the farmer and that the farmer could sue the oil and gas lessee for damage to his crops.

GULF/CHEVRON'S ASSIGNMENT OF ERROR NO. 3
Gulf/Chevron's third assignment of error is that the damage award was too high. It argues that the restoration award cannot exceed $304,000 because that was the jury's determination of the value of the Hazelwood property.
In the light of the Louisiana Supreme Court's recent opinion in Corbello v. Iowa Production, 02-C-0826 (La.02/25/03), 2003 WL 536727, ___ So.2d ___, this assignment has no merit.
Gulf/Chevron's argument begins with the jury's specific findings of fact in its answers to interrogatories. First, it points out that the jury found that $2,000,000 would compensate Hazelwood for the property damage due to the breach of contract. The jury also found that the value of the property was $304,000. The jury found *388 specifically that there was no reason personal to Hazelwood for restoring the property to its original condition and that there was no reason to believe Hazelwood Farm would, in fact, restore its property. Elsewhere, the jury stated that its $2,000,000 award was "for restoring the property." Based on these jury findings of fact, Gulf/Chevron contends that Hazelwood is getting over six times what the property is worth and will not use the money to restore the property. It argues that this is in violation of the rule of Roman Catholic Church v. Louisiana Gas Service Co. 618 So.2d 874 (La.1993), and its holding:
Accordingly, we conclude that, as a general rule of thumb, when a person sustains property damage due to the fault of another, he is entitled to recover damages including the cost of restoration that has been or may be reasonably incurred, or, at his election, the difference between the value of the property before and after the harm. If, however, the cost of restoring the property in its original condition is disproportionate to the value of the property or economically wasteful, unless there is a reason personal to the owner for restoring the original condition or there is a reason to believe that the plaintiff will, in fact, make the repairs, damages are measured only by the difference between the value of the property before and after the harm.
Id. at 879-80.
It concludes its argument by urging that although the Church case dealt with a tort-based claim for damages to land, the Church rule limiting recovery to the value of the property before and after the harm should apply to contract claims as well.
The recent Corbello decision puts this issue to rest. The supreme court announced that "damages to immovable property under a breach of contract claim should not be governed by the rule enunciated in Church." Id. at ___. Distinguishing tort-based damages from contract-based damages, the court said that it is "logical in tort cases to tether the amount of damages by balancing the amount to be paid by the negligent tortfeasor against the goal to restore the plaintiff, as closely as possible, to the position that he would have occupied had the accident never occurred." Id. at ___. However, the damage award for a breach of a contractual obligation to reasonably restore property need not be tethered to the market value of the property. Id at ___. This is because the measure of damages in a breach of contract case is governed by the contract. Corbello, ___So.2d ___. The terms of a contract, which convey the intentions of the parties, overrule any policy considerations behind the rule limiting damages in tort cases. Id. at___.
The Corbello court found that the contract language bound the Corbello defendant, Shell, upon termination of the lease to reasonably restore the premises as nearly as possible to their present condition. Id. at___. This contractual obligation, the court said, did not limit the obligor's liability for reasonable restoration to the market value of the property. Id. at ___.
Applying these precepts to our present facts, we note that the language of the stipulation pour autrui requires Gulf/Chevron to be "responsible for all damages caused by [its] operations." In Magnolia Coal, 576 So.2d at 477, similar language, "Lessee shall pay for all damages caused by Lessee's operations" was regarded as the cost of cleaning up the contaminated area caused by the pollution for which the defendant was responsible. That interpretation of the contractual obligation contained in the stipulation pour autrui is virtually conceded in our present *389 case: Gulf/Chevron states in brief that "some environmental remediation was needed." Therefore, we reject the argument that the restoration or remediation award cannot exceed the value of the property. Gulf/Chevron's obligation was to clean up and restore the property. The jury calculated the cost of that clean-up and restoration to be $2,000,000.

GULF/CHEVRON'S ASSIGNMENT OF ERROR NO. 4
By this assignment, Gulf/Chevron complains that the trial judge erred in overruling its plea of prescription. It argues that the claim, regardless of whether it is delictual or contractual, prescribed before suit was filed.
Hazelwood acquired the property in 1991. It filed suit on February 13, 1997. The trial court found as a fact that it acquired notice of the potential for radiation damage in 1996, less than a year before suit was filed. The trial court, applying the principle of contra non valentem, overruled the exception of prescription.
Although contra non valentem is a legal principle, a determination of whether or not Hazelwood was indeed prevented from filing its claim is an issue of fact, and the trial court's finding of fact as to this issue is subject to the manifest error, clearly wrong standard of review. Amoco Prod. Co. v. Texaco, Inc., 02-240 (La.App. 3 Cir. 01/29/03); 838 So.2d 821. We find no manifest error in this finding of fact. It was not until 1996 that Hazelwood, through Mr. Edmundson, learned of the naturally occurring radioactive materials (NORM) presence and groundwater contamination through scientific testing. He testified that it was the discovery of the radiation problem and groundwater contamination that motivated the suit. Mr. Edmundson did not have the ability to detect radioactivity and groundwater pollution on his own. The trial court observed "[t]he mere fact that there's a presence of oil and gas operations does not automatically mean there is pollution and contamination...." It was in March 1996 that Mr. Edmundson inspected the property with an expert, took samples, and learned of the soil and groundwater contamination.
Damage is sustained, within the meaning of prescription, only when it has manifested itself with sufficient certainty to support the accrual of a cause of action. Cole v. Celotex Corporation, 620 So.2d 1154 (La.1993). The damages suffered must at least be actual and appreciable in quality. Where a claimant has suffered some but not all damages, prescription runs from the day on which he suffered actual and appreciable damages even though he may thereafter realize more precise damages. Harvey v. Dixie Graphics, Inc., 593 So.2d 351 (La.1992). However, prescription will not commence at the earliest possible indication that plaintiff may have suffered some wrong. It will begin to run when plaintiff has a reasonable basis to pursue a claim against a specific defendant. Jordan v. Employee Transfer Corporation, 509 So.2d 420 (La.1987). Prescription should not be used to force a potential plaintiff who believes that he may have a cause of action to rush to the courthouse to file suit against all parties that may have caused the damage. Miley v. Consolidated Gravity Drainage District No. 1, 93-1321 (La.App. 1st Cir.9/12/94); 642 So.2d 693.
Labbe Serv. Garage, Inc. v. LBM Distrib., Inc., 94-1043, p. 11 (La.App. 3 Cir. 2/1/95); 650 So.2d 824, 829.
When a party has been damaged by the conduct of another arising out of a contractual relationship, the former *390 may have two remedies; a suit in contract or an action in tort, and he may elect to recover his damages in either of the two actions. Federal Ins. Co. v. Ins. Co. of North America, 262, La. 871, 262 La. 509, 263 So.2d 871 (1972). A third party beneficiary of a stipulation pour autrui claiming damages arising out of the breach of a contractual obligation in a lease states a cause of action in contract. United Gas Pipe Line Co. v. Cargill, Inc., 612 So.2d 783 (La.App. 1 Cir.1992). Beach of contract claims are subject to a liberative prescription period of ten years as provided by La.Civ.Code art. 3499. Amoco Prod. Co., 838 So.2d 821. There is no merit to this assignment of error.

GULF/CHEVRON'S ASSIGNMENT OF ERROR NO. 5
By this assignment, Gulf/Chevron asks that we find the trial court erred when it allowed Hazelwood to make arguments and to seek relief contrary to facts which Hazelwood had alleged in its pleadings. It also argues that the trial judge erred in failing to properly instruct the jury as to the effect of these allegations.
Hazelwood named several defendants in its original and amending petitions. They included Gulf, Chevron, International Petroleum, and Liberty Oil and Gas. It alleged that all defendants constructed and used the 12-acre brine pit and the two production pits. Before trial it dismissed all defendants except Gulf/Chevron, and the evidence during the trial preponderated that only Gulf/Chevron constructed and used the three pits. Gulf/Chevron argues that Hazelwood's pleaded allegations in its petition and amending petition, that others participated in the construction and use of the three pits, should be regarded as a judicial confession, thereby establishing as a fact judicially confessed that others besides Gulf/Chevron participated in the construction and use of the pits.
The trial court's rulings were correct. The case of Jackson v. Gulf Ins. Co., 250 La. 819, 199 So.2d 886 (La.1967), gives the history of the judicial confession principle in Louisiana and tells us what it means. The Louisiana Civil Code Article then defining it was article 2291. Today the substance of that article is reproduced, without changing the law, in Article 1853. The article reads:
A judicial confession is a declaration made by a party in a judicial proceeding. That confession constitutes full proof against the party who made it.
A judicial confession is indivisible and it may be revoked only on the ground of error of fact.
In Jackson, 199 So.2d at 890-91, the court said: "[a]s a legal concept, the judicial confession is designed to dispense with evidence. It has the effect of withdrawing the subject matter of the confession from issue." And, "it is of the nature of this kind of admission that it be, by intention, an act of waiver relating to the opponent's proof and not merely an assertion made for some independent purpose...." Id. Finally, "[a] judicial confession under [the article] is a party's admission, or concession, in a judicial proceeding of an adverse factual element, waiving evidence as to the subject of the admission." Id. Hazelwood's unilateral pleadings in its petition and amending petition were not judicial confessions.
The above completes our disposition of the assignments of error raised by Gulf/Chevron as First Appellant. We turn now to the issues raised in the appeal of Hazelwood.

HAZELWOOD'S ASSIGNMENT OF ERROR NO. 1
During the time period between 1984 and 1996, Article 2315.3 of the *391 Louisiana Civil Code gave the right to exemplary damages to plaintiffs whose injuries were caused by a defendant's wanton or reckless disregard for public safety in the storage, handling or transportation of hazardous or toxic substances. The article does not apply to conduct that occurred before 1984. Anderson v. Avondale Ind., Inc., 00-2799 (La.10/16/01); 798 So.2d 93. It was repealed in 1996. Summary judgment is an appropriate procedural vehicle to determine liability for exemplary damages. Chustz v. J.B. Hunt Transp., Inc., 95-0356 (La.11/6/95); 662 So.2d 450.
In pretrial proceedings, the court granted Gulf/Chevron's motion for partial summary judgment and dismissed Hazelwood's exemplary damage claim. At the beginning of trial, it reconsidered its ruling and allowed Hazelwood to present evidence that Gulf/Chevron stored or handled hazardous materials between 1984 and 1996. At the conclusion of plaintiff's evidence at trial, the court reinstated its ruling dismissing the Article 2315.3 exemplary damage claim.
Hazelwood assigns error to this ruling. We review summary judgments de novo. Bonnette v. Conoco, Inc., 01-C-2767 (La.1/28/03); 837 So.2d 1219.
According to the recent decision in Bonnette, 837 So.2d 1219, if a defendant acts in compliance with DEQ regulations in effect during the events at issue, it cannot be said that its conduct was highly unreasonable or that it involved an extreme departure from ordinary care, and the defendant is not liable for punitive damages under Article 2315.3. In the present case, Richard Brackin of the DEQ testified that the DEQ did not regulate oilfield NORM until 1989. All of Gulf/Chevron's activities and conduct occurred well before that date. The only event that happened after that date was when Gulf/Chevron plugged and abandoned a well in 1991 upon order from the State's Department of Conservation. There was no evidence that that event involved the handling of hazardous materials. Applying the rule of Bonnette, 837 So.2d 1219, the trial judge's summary judgment dismissing the exemplary damage claim was correct.

HAZELWOOD'S ASSIGNMENT OF ERROR NO. 2
By this assignment, Hazelwood claims that inadequate restoration damages were caused by the trial judge's error in denying its request for discovery of amounts Chevron had spent for remediation at other sites. Hazelwood argues that discovery of these costs would have enabled it to better cross-examine Gulf/Chevron's experts, which in turn would have demonstrated to the jury that the cost estimates of those experts were unrealistically low. Hazelwood does not attack the award itself as being an abuse of the jury's discretion. Instead, it blames an "unrealistically low" damage award on trial court error in limiting cross-examination of Gulf/Chevron's experts. To evaluate this assignment, it is appropriate that we look at what Hazelwood was trying to prove.
The two elements of Hazelwood's claim for damages were radiation contamination and groundwater contamination. Throughout the trial, the damage on which the evidence primarily focused was radiation contamination. Unlike the surface damage caused by abandoned physical objects, which were scattered out all over the 686 acres, the radiation contamination was very localized. In fact, the vast majority of the expert testimony concerning the radiation problem and its remediation requirements and costs centered on the 12-acre brine pit and two nearby production pits. The other damage element was *392 groundwater contamination. This, too, according to the testimony, to the extent that groundwater contamination existed, was traceable to the brine pit and the two production pits.
Because of the nearly exclusive attention given by the testimony to the radiation and groundwater elements of damage, it does not appear that the cost of cleanup of the abandoned physical objects motivated this lawsuit. Indeed, as was revealed when we discussed Gulf/Chevron's prescription assignment of error, Hazelwood's Mr. Edmundson as much as conceded the point, because he testified that his reason for suing was the discovery of the radiation and groundwater problems. It was clear, therefore, that Hazelwood's quest for damages was to be measured by the radiation and groundwater contamination.
The evidence revealed that the 12-acre brine pit was originally used as an evaporation storage pit for the operation of the wells, then later it was used as a settling pit during the excavation of the salt dome caverns. This activity was exclusively done by Gulf/Chevron. According to William Kimbrell, a petroleum engineer who testified for Hazelwood, the two production pits and especially the brine pit were the major sources of contamination. He testified it would cost $2,900,000 to remediate all the pits on the property, and $803,000 to remediate the production pits used by Gulf/Chevron. Stanley Waligora, a health physicist testifying for Hazelwood, believed that the radiation resulting from NORM in the brine pit was considerably above background[2] and needed remediation. He testified it would cost $68,000,000 to clean up the brine pit. Another Hazelwood witness, Edwin Cargill, an expert in radiation protection and remediation, agreed with Mr. Waligora's estimate, and stated that 99.5% of the $68,000,000 price was made necessary because of the brine pit.
Gulf/Chevron's experts, on the other hand, reached much lower estimates of the cost of NORM remediation. Carol Berger, a health physicist who owned and operated a radiation remediation business, said it could be done for $203,523.
The testimony regarding the necessity for remediation of groundwater contamination and its cost was similarly divergent. James E. Brinkman, a hydrogeologist for Hazelwood, using bore hole samples going to a depth of 23 feet in the brine pit, found elevated levels of chlorides, radium, lead, barium, and chromium. From this he concluded that the groundwater below the pits was contaminated, theorizing that the contaminated water was moving downward into both the Atchafalaya and the Chicot Aquifers. Because they were the sources of drinking water in St. Landry Parish, he recommended a $15,000,000 water remediation program for the benefit of the aquifers. He found "non-detects" of radium and heavy metals in the water sample from the irrigation well. Mr. Brinkman's counterpart on the other side, hydrogeologist Dr. Brian Carter, testified that the brine pit samples were taken from a shallow 23 foot level, that in St. Landry Parish there was a fifty or sixty foot layer of clay below that, and that the average depth of water wells in the parish was 140 feetall meaning that there was no linkage between the brine pit residue and the aquifer system at the irrigation well level. He testified that the chlorides in the brine pit could not move through the clay layer and into the aquifers. Furthermore, according to Dr. Carter, the irrigation well on the Hazelwood property was 188 feet *393 deep, and water quality data from all sources, including Hazelwood's tests, showed no difference from other water wells around St. Landry Parish and no excesses in chlorides or other elements. In short, he testified that there was no water contamination, and that a relatively inexpensive monitoring plan was all that would be needed.
Both in pretrial rulings and in rulings during trial, the trial court restricted discovery and testimony to the cost of remediation of the Hazelwood contamination. These rulings, even as to the regulation of pretrial discovery, were within the broad discretion of the trial court. A trial court has broad discretion in regulating pretrial discovery, including the scope of discovery. Moak v. Illinois Cent. R.R. Co., 93-0783 (La.1/14/94); 631 So.2d 401; Ward v. Tenneco Oil Co., 564 So.2d 814 (La.App. 3 Cir.1990). Hazelwood wanted to discover the cost of Chevron clean-ups at other sites in Louisiana and Mississippi. The trial judge would not allow it, reasoning that other sites involved entirely different facts, different property, different damages, and different remediation requirements. To the trial judge, it was a matter of relevance and an unnecessary consumption of time and confusion of the issues. We find no abuse of discretion in this ruling.

HAZELWOOD'S ASSIGNMENT OF ERROR NO. 3
Hazelwood's final assignment of error is that the trial judge failed to follow the proper procedure in setting its expert witness costs and by setting those costs in abusively low amounts. The argument for this assignment does not particularize as to any expert witness or witnesses; it merely addresses in general the contention that the fees and costs of all experts were insufficient.
The trial judge did not conduct separate hearings, outside the presence of the jury, to determine the fees he fixed for each of the Plaintiff's experts and assessed as costs to be paid by Gulf/Chevron. However, most of them testified what hourly rate they charged and the extent of their work on the case before trial. The judge knew the duration of their testimony. The total of awards for the plaintiff's ten experts was $11,650, ranging from a low of $300 to a high of $1,500.
Interpreting La.R.S. 13:3666, the court of appeal in Allen v. Roadway Express, Inc., 31,628 (La.App. 2 Cir. 2/24/99); 728 So.2d 1015, stated that a trial court is authorized to set expert witness fees based on his direct hearing and observation of the experts at trial. That is what the trial judge did in this case. Our review of the record convinces us that the trial court was thoroughly acquainted with the contribution that each witness made to the case and was in a sound position to evaluate a reasonable fee to be taxed as costs. This was done after the jury had returned its verdict. The holding of a special rule to show cause hearing to fix fees, although a permissible alternative under La.R.S. 13:3666, was entirely unnecessary. Nearly every witness testified as to his or her hourly rate.
The trial court "may render judgment for costs ... as it may consider equitable." La.Code Civ. P. art.1920. On review, an appellate court can modify a trial court's assessment of costs only upon a showing of abuse of discretion. Smith v. Louisiana Farm Bureau Cas. Ins. Co., 603 So.2d 199 (La.App. 3 Cir.), writ denied, 605 So.2d 1115 (La.1992).
Hazelwood asks us to compare the award of $65,000 as expert fees in Corbello, affirmed by this court at 806 So.2d 32. In that case the cost of restoration alone *394 awarded by the jury was $33,000,000. In our present case the restoration award was $2,000,000. In terms of the ratio between the damage award and the total of witness fees in these two cases, the comparison is not an unfavorable one. Even so, in fixing expert witness fees, each case must turn on its own peculiar facts and circumstances. Viator v. Liverpool & London Steamship Protection & Indem. Assoc., 97-264 (La.App. 3 Cir. 10/8/97); 701 So.2d 487, writ denied, 98-0027 (La.3/13/98); 712 So.2d 880, cert. denied, 525 U.S. 821, 119 S.Ct. 63, 142 L.Ed.2d 49 (1998). We can find no abuse of discretion in the trial court's award of expert witness fees.
For the forgoing reasons, the judgment of the trial court is affirmed. Hazelwood Farm, Inc., is assessed all costs of this appeal.
AFFIRMED.
NOTES
[1] The evaporation pond is also referred to as the brine pit, the evaporation pit, and the brine evaporation pit. The witnesses, including Hazelwood's, disagreed as to its size, some thinking it was 12 acres, others that it was 21 acres. It was by all accounts an exceptionally large brine pit. Most of the witnesses believed it was 12 acres.
[2] We glean from the experts that radiation is present nearly everywhere and its presence is measurable at a constant low level. That constant is called background.