KNOLL, J.,
concurring in part and dissenting in part.
|J concur only with the portion of the majority opinion affirming judgment in favor of the Marin plaintiffs on their contract claims. The remainder of the majority opinion contains serious and fundamental errors which have the potential to do great damage to the jurisprudence of this state. Accordingly, I respectfully dissent.
First, the majority misapplies the continuing tort doctrine, which prevents a tort claim from prescribing as long as the operating cause of injury continues. It is undisputed that, to this day, additional oilfield waste continues to seep from defendants’ unlined pits into plaintiffs’ property. As additional waste products enter the land, plaintiffs suffer additional and increasing damages. Incredibly, the majority holds prescription began to run from the moment the pits were closed. This exceedingly narrow interpretation of the continuing tort doctrine means that, no matter how much additional waste continues to seep onto the property in the future, plaintiffs will be left without a remedy.
|2Second, the majority errs in its discussion of contra non valentem. We have long held contra non valentem tolls prescription where the “debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action.” Hyman v. Hibernia Bank & Trust Co., 139 La. 411, 71 So. 598, 604 (1916). The trial court found that, beginning in 1991, Exxon provided plaintiffs with documents purporting to show the remediation was complete and the pits were cleaned in accordance with state regulations. These representations were objectively false and misleading. The trial court made a factual determination and found the plaintiffs believed Exxon and “detrimentally relied on these disclosures.” The majority admits that Exxon’s blatant factual misrepresentation were “less than acceptable,” yet inexplicably concludes these lies are insufficient to trigger contra non valentem. We should affirm the trial court, as the record demonstrates Exxon purposefully misled plaintiffs into believing their land was properly remediated, lulling them into a false sense of security and fraudulently discouraging them from timely filing suit. This is a textbook case of contra non valentem. The majority effectively encourages polluters to commit fraud in order to prevent plaintiffs from bringing meritorious suits.
Moreover, the majority breaches the manifest error doctrine and fails to give due deference to the trial court’s finding of fact that plaintiffs had no actual or constructive knowledge of the contamination. After conducting two separate site visits and hearing testimony from witnesses for both sides, the trial court found plaintiffs were unable to determine the property was contaminated until they obtained an expert report. Given the underground nature of the contamination and the fraud on the part of Exxon, there was nothing unreasonable about the court’s factual findings, and the majority errs in overturning it absent manifest error.
| ¡¡A. The Majority Misapplies The Continuing Tort Doctrine
The majority opinion undermines the continuing tort doctrine, which tolls pre *264 scription on tort claims as long as the offending action continues to cause successive damages to plaintiff. When “the damages claimed are predicated on alleged continuous wrongful acts, causes which are supposed to occur daily, and to produce effects daily repeated ... ‘prescription, whatever the length of time, has no application.’” Di Carlo v. Laundry & Dry Cleaning Service, 178 La. 676, 152 So. 327, 329 (1933)(quoting Northwestern Fertilizing Co. v. Hyde Park, 97 U.S. 659, 668-69, 24 L.Ed. 1036 (1878)). A continuing tort exists whenever the “operating cause of injury is a continuous one and gives rise to successive damages.” Crump v. Sabine River Authority, 98-2326, p. 7 (La.6/29/99), 737 So.2d 720, 726.
The continuing tort doctrine has been applied by Louisiana courts for nearly eighty years. We most recently considered the doctrine in Hogg v. Chevron, 2009-2632 (La.7/6/2010), 45 So.3d 991. In Hogg, plaintiff landowners sued a service station owner whose underground tanks had leaked, spilling chemicals which contaminated plaintiffs’ land. Id. at 994. Although the leaking tanks were replaced in 1997, the chemicals were not remediated and continued migrating from defendant’s land towards plaintiffs’ land and into their stream. Despite the continuously increasing nature of this contamination, this Court nonetheless found the operating cause of injury was the leaking tanks, not the contamination itself. Prescription therefore began to run the day the tanks were replaced. Id.
In my view, Hogg was wrongfully decided. See Id. at 1007 (Knoll, J., dissenting). The majority artificially limited the continuing toi't doctrine even where the injury-causing activity (i.e., the contamination) remained under plaintiffs’ land, causing additional damages. As long as harmful chemicals remain under plaintiffs’ Inland, the trespass continues, and prescription cannot begin while the wrongful conduct is still ongoing. Id. at 1003. This rationale applies equally in the case currently before us, and I dissent for the same reasons set forth in Hogg.
Arguendo, even if Hogg were a correct statement of law, the majority opinion misapplies Hogg and expands its holding well beyond its facts. The primary question in any continuing tort case is whether “the operating cause of injury is a continuous one.” Crump v. Sabine River Authority, 98-2326, p. 7 (La.6/29/99), 737 So.2d 720, 726. In Hogg, after the leaking gas tanks were removed, no additional chemicals entered the land.[1] The Court defined the “operating cause of injury” as the leak itself, which ceased when the tanks were removed. Here, unlike the “leaking tanks” in Hogg, the unlined waste pits remain on plaintiffs’ property and continue to leach additional noxious chemicals into the soil. As each additional ounce of waste migrates under plaintiffs’ land, the level of contamination increases, and plaintiffs’ successive damages increase.
Here, through faulty analysis, and despite overwhelming evidence to the contrary, the majority somehow concludes that the continued leakage from the pits does not constitute a continuing tort. Instead, it holds the “operating cause of injury” was “the actual disposal or storage of the oilfield waste in unlined pits on plaintiffs’ property.” This is untenable. There is nothing inherently injurious about a mineral lease operator disposing of oilfield wastes pursuant to the parties’ lease. Put *265 otherwise, plaintiffs have no actionable claim based on the mere digging of the pit or the placing of waste in that pit. The claim arises only when contaminants begin to seep out of that pit and into the plaintiffs’ soil.
A simple hypothetical will demonstrate the flaw in the majority’s position. | ¡Assume the pits dug by Exxon in the 1940s were properly lined, and the contaminants were safely stored. However, over the years the lining began to deteriorate. In 1991, for the first time, contaminants began to escape from the pits and enter plaintiffs’ land. If, as the majority holds, the wrongful “conduct terminated when the pits were closed,” plaintiffs’ claim would have prescribed when the pit was closed in the 1940s, many years before any contaminants entered the property. Plaintiffs would be precluded from seeking any relief for any contamination, no matter how serious, resulting from the oilfield operations. The majority’s position is inequitable, contrary to established law, and creates bad policy.
B. Contra Non Valentem
The majority opinion also errs in its consideration of the contra non valentem doctrine. Contra non valentem is an “equitable doctrine of Roman origin, with roots in both civil and common law,” designed to avoid the harshness of applying prescription where the plaintiff has been prevented from timely filing suit. Carter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261, 1268. Without citation to any authority, the majority claims contra non valentem requires “extraordinary circumstances.” We have never held the application of contra non valentem requires “extraordinary circumstances,” and it is regularly applied by Louisiana courts.
There are four circumstances where contra non valentem applies:
(1) where there was some legal cause which prevented the courts or their officers from taking cognizance of or acting on the plaintiffs action;
(2) where there was some condition coupled with the contract or connected with the proceedings which prevented the creditor from suing or acting;
(3) where the debtor himself has done some act effectually to prevent the creditor from availing himself of his cause of action; and
| fi(4) where the cause of action is not known or reasonably knowable by the plaintiff, even though this ignorance is not induced by the defendant.

Id.

The trial court found the last two categories were met. Exxon purposefully misled plaintiffs into believing their land had been properly remediated, thereby preventing plaintiffs from timely availing themselves of the cause of action. The court also held that determining whether the property was contaminated requires scientific analysis beyond the abilities of a normal person, so an “average person would have no knowledge of whether a pit was properly cleaned or not.” As detailed below, these findings by the trial court are well-supported by the record and should not be disturbed.
1. Exxon’s Misrepresentations
First, there is ample evidence in the record to support the trial court’s finding that Exxon misled plaintiffs into believing the waste pits had been cleaned in conformance with regulatory standards. Prior to 1991, Claude Breaux, acting on behalf of both the Marin plaintiffs and the Breaux plaintiffs, repeatedly asked Exxon to close the pits and conduct necessary remediation. Exxon’s attempted remediation ceased in 1991.
*266 The majority concedes Exxon conducted two additional environmental assessments after the 1991 remediation — one in 1993, one in 2001 — and both of these assessments revealed contamination exceeding regulatory limits. Since at least 1986, Exxon was aware that the produced water on the property included radioactive material, including measurable amounts of radium 226 and 228, yet did not report this to the DEQ as required by state regulations. In short, Exxon knew the property was significantly more contaminated than either plaintiffs or the state believed, yet 17purposefully covered up this contamination.[2]
It is well settled that contra non valen-tem applies in cases involving “acts of fraud and misrepresentation intentionally committed by defendants (or their representative) designed to hinder, impede or prevent plaintiffs from asserting their cause of action or lull them into a false sense of security.” Plaquemines Parish Commission Council v. Delta Development Co., Inc., 502 So.2d 1084, 1056-57 (La.1987); Nathan v. Carter, 372 So.2d 560, 563 (La.1979).
This species of contra non valentem is simply a specific example of the general legal principle that a party cannot “take advantage of his own wrongful act.” Nathan, 372 So.2d at 562. Yet that is precisely what the majority opinion allows Exxon to do. Over a period of several years, Exxon répeatedly told plaintiffs the property was cleaned up within regulatory standards. In 1991, Exxon sent a letter stating “You will find that all parameters including salt are well below accepted standards and state regulations.” Plaintiffs, perhaps naively, trusted Exxon’s representations and chose not to sue. Exxon, a highly sophisticated party, was in a far better position than the plaintiffs to assess the level of contamination, and knew that plaintiffs relied on it to perform the relevant testing and remediation. Exxon used its superior position to mislead plaintiffs and prevent them from timely filing suit. This is precisely the kind of fraudulent activity which triggers the application of contra non valentem.
Exxon also misled the plaintiffs by repeatedly telling them it would fix any issues on the property, then failing to do so. As Claude Breaux testified, Exxon employees “said we will address [the remediation issues] and get back to you. That | ^stopped until — even when suit was filed, I was reluctant to file suit because Exxon had convinced me they were still coming back. I still thought Exxon was coming back to fix my pit sites” (Emphasis added). This is the very definition of “lulling” a plaintiff into a false sense of security to prevent him from filing suit.
The majority’s holding would be bad enough if this Court were acting as the finder of fact with discretion to make judgment calls and weigh the evidence. We are not. Instead, we are required to give great deference to the trial court’s factual findings, and may upset its ruling only upon a finding of manifest error. Stobart v. State Dept. of Transportation and Development, 617 So.2d 880, 882 (La.1993). Incredibly, the majority opinion simply skims past the manifest error doctrine, which is a fundamental precept of appellate review.[3] There is nothing in the rec *267 ord suggesting that the trial court’s finding of fraud and misrepresentation by Exxon was objectively unreasonable or that the trial court manifestly erred.
The majority opinion admits “Exxon misled plaintiffs by not disclosing the extent of the contamination,” but excuses this fraud by noting Exxon “did nothing to prevent plaintiffs from investigating the cause of the sugarcane loss for themselves.” In essence, the majority does not castigate Exxon for lying, but finds fault with plaintiffs for believing the lies. Permitting Exxon to profit from its own misrepresentations is both extraordinarily inequitable and contrary to established law.[4]
2. Plaintiffs’ Constructive Knowledge of the Contamination
1 gContra non valentem also applies where the “cause of action is not known or reasonably knowable by the plaintiff.” Carter v. Haygood, 2004-0646 (La.1/19/05), 892 So.2d 1261, 1268. This particularly applies where specific scientific or technical knowledge is necessary to discover the injury. For instance, where a plaintiff suffers injury as a result of asbestos exposure, but was not diagnosed for several years, prescription does not begin to run until diagnosis. Owens v. Martin, 449 So.2d 448, 451 n. 4 (La.1984).
Here, the underground contamination of plaintiffs’ property is not immediately noticeable. As evidenced by the mountain of specialized expert testimony introduced at trial, it takes a significant amount of training to determine the nature and scope of such contamination. The majority cites South Central Bell Telephone Co. v. Texaco, Inc., 418 So.2d 531, 582 (La.1982), which holds “the prescriptive period for damage to adjacent land commences when the damage becomes apparent and the injured party discovers who or what caused it.” However, there is no evidence that the contamination beneath plaintiffs’ land was “apparent.” The noxious substances — highly concentrated saltwater, heavy metals, and radioactive material[5]— are invisible and underground. As the trial court explained:
The Court further finds that the average person would have no knowledge of whether a pit was properly cleaned or not. After trying this case for some three years and having viewed the property on two separate occasions with the attorneys, the Court cannot see with the naked eye that anything is wrong with the surface of the land. However, after hearing the testimony, the Court believes that there are some problems with the land where oilfield pits existed, pipe cleaning existed, and where oilfield surface operations were conducted. The Court finds, as did | lftthe trial court and Court of Appeal in Hazelwood, supra,[6] that the doctrine of contra non valen-tum [sic] applies to this case and prescription does not begin to run until the *268 plaintiffs had full knowledge of the extent of damage as reported by the initial report of Greg Miller, plaintiffs’ expert.
The manifest error doctrine is particularly applicable in this situation. The trial court presided over the case for three years, listened to several days of witness and expert testimony, viewed dozens of exhibits, and had firsthand knowledge of the condition of the property from two site visits. This Court, viewing a cold record, is simply not in a position to second guess the trial court’s considered factual findings and conclude plaintiffs “should have known” the property was contaminated based solely on the fact that some, but not all, of the sugarcane planted on the property had stunted growth. The majority implies plaintiff Claude Breaux’s prior employment for Exxon gives him insight into soil contamination and remediation. However, Breaux worked in fuel delivery, and there is no evidence that he or any of the other plaintiffs had the specialized scientific knowledge necessary to determine whether the land was contaminated. Indeed, Breaux testified with respect to the pits “I did not know it was hazardous. I have no reason to know.” Later, he testified “Did I know those pits had hazardous chemicals? No sir, I did not. I thought it might have been water.” The trial court judged his testimony credible, and we must defer to the court’s credibility determination.
The majority’s citation to Hogg v. Chevron, 2009-2632 (La.7/6/2010), 45 So.3d 991, is again inapposite. In Hogg, plaintiffs received two official written notices from the Louisiana Department of Environmental Quality stating their stream was | n contaminated by gasoline which had leaked from defendant’s tanks. This is sufficient to put any reasonable plaintiff on direct notice of contamination. Neither the Marins nor the Breauxs ever received any such direct notice, and plaintiffs had no proof of the contamination until they took it upon themselves to hire an expert to perform tests in 2003. The majority faults the plaintiffs for not hiring an expert sooner. However, plaintiffs relied on Exxon’s representations that the contamination had been adequately cleaned up. Plaintiffs had no reason to suspect Exxon was lying to them, and thus no reason to hire their own expert.

Conclusion

In my view, the majority opinion misapplies the law and fails to give proper deference to the trial court’s findings of fact. The majority opinion is a classical example of a court substituting its opinion for that of the finder of fact. This is a violation of the manifest error doctrine we frequently cite in reversing appellate opinions which overrule a trial court’s factual findings.
This case overwhelming supports a reasonable basis for the finder of fact’s conclusion. This is not our function. We function as a reviewing court, not a court of first impression, which is the pivotal impetus of the manifest error doctrine. The majority’s opinion reversing the trial court’s factual findings is an aberration of the manifest error doctrine; thus I cannot agree.

. Nor was this the first time Exxon misrepresented the true amount of environmental damage its operations were causing. As far back as 1966, Exxon’s predecessor company Humble discovered the amount of saltwater created by the operations was over two thousand times higher than the amount it reported to the state. Yet Humble, in order to avoid additional cleanup costs, chose to keep silent.

. Significantly, the majority does rely on the manifest error doctrine later in the opinion in *267 affirming the dismissal of plaintiffs’ claim for groundwater contamination.

. The majority's citation to Crump v. Sabine River Authority, 98-2326 (La.6/29/99), 737 So.2d 720, 731, is singularly inapposite. In Crump, there was “no evidence or allegation of concealment or fraudulent conduct on the part of the defendant.” (Emphasis added). Here, Exxon’s fraud is well-established.

. The heavy metals discovered under plaintiffs’ land include cadmium, lead, and arsenic, which plaintiffs’ expert described as "greatly exceeding” the relevant standards. The soil samples also contained barium, radium-226, and radium-228, which are radioactive heavy metals.

. Hazelwood Farm, Inc. v. Liberty Oil & Gas Corp., 2002-266 (La.App. 3 Cir. 4/2/03), 844 So.2d 380, writ denied, 2003-1585 (La. 10/31/03) 857 So.2d 476.