# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT


## 09-1237 c/w 09-1239


**DEL DEAN DAVID ET UX**

**VERSUS**

**VELSICOL CHEM. CORP**

**AND**

**WILHELM**

**VERSUS**

**MOSAIC GLOBAL OPERATIONS**

**********

APPEAL FROM THE
FIFTEENTH JUDICIAL DISTRICT COURT
PARISH OF VERMILION, NO. 82,490 c/w 84,514
HONORABLE MARILYN C. CASTLE, PRESIDING
**********


**SYLVIA R. COOKS**
**JUDGE**


**********


Court composed of Ulysses Gene Thibodeaux, Chief Judge, Sylvia R. Cooks, John D. Saunders, Elizabeth A. Pickett, and J. David Painter, Judges.

**REVERSED AND REMANDED. Pickett, J., dissents in part and concurs in part.**

**Ranier, Gayle and Elliot,L.L.C.**
**Drew A. Ranier**
**N. Frank Elliot, III**
**Brett M. Powers**
**1419 Ryan Street**
**Lake Charles, LA 70601**
**(337) 494-7171**
**Broussard & David**
**Richard C. Broussard**
**P.O. Box 3524**
**Lafayette, LA 70502-3524**
**(337) 233-2323**

**The Moresi Firm**
**Paul G. Moresi, III**
**111 S. State Street**
**Abbeville, LA 70511**
**(337) 898-0111**

**Robinson, Clacagnie & Robinson**
**Mark Robinson**
**Kevin F. Calcagnie**
**Alexis W. Myer**
**620 Newport Center Drive**

Newport Beach, CA 92660
(949) 720-1288
(Admitted Pro Hac Vice)

Counsel for Plaintiffs/Apellants,
     Del Dean David Et Ux

Irwin Fritchie Urquhart
& Moore LLC                        Charles R. Sonnier
James B. Irwin                     The Sonnier Firm
Quentin F. Urquhart, Jr.           Two South Magdelan Square
David M. Melancon                  Abbeville, LA 70510
400 Poydras Street, Suite 2700     (337) 893-5973
New Orlreans, LA 70130
(504) 310-2100

Counsel For Defendant/Appellee, SmithKline
     Beecham Corp., d/b/a GlaxoSmithKline

**COOKS, Judge.**

<u>                              </u>*Facts and Procedural History*

Plaintiffs in these consolidated cases allege Defendants' product, Cooper's Cattle Dip, contaminated their land and drinking water with arsenic and other hazardous chemicals. They allege the contamination of their lands and drinking water occurred prior to 1970 when Cooper's Cattle Dip was used in dipping vats located on, or adjacent to, all of the Plaintiffs' properties. These dipping vats were used to dip cattle in an effort to eradicate ticks which were killing cattle across the United States. Plaintiffs further allege the product was also used in other applications in the area of Plaintiffs' properties for many years, up to 1985. According to Plaintiffs' allegations, the ground water under their lands, which they have consumed for many years, is contaminated with high levels of arsenic, in some instances *eighty times* the Environmental Protection Agency's (EPA) acceptable levels. Plaintiffs allege that the presence of an alarmingly high rate of certain types of cancer among the residents of their area eventually lead to the discovery of the high levels of arsenic contamination in the ground water running through the entire community in which they live. A local Catholic priest, himself a victim of cancer, encouraged Plaintiffs' community to test the ground water as a possible explanation for the high rate of certain types of cancer among the population of the area in which the Plaintiffs have lived for generations. The alarming results of those tests precipitated the subject lawsuits.

Plaintiffs' initial Petition For Damages has been amended and supplemented several times, adding additional plaintiffs and defendants, adding or restating the factual allegations and legal theories upon which Plaintiffs' claims for damages rely, and adding or restating the various legal capacities in which certain of the Plaintiffs

1

make their claims.

On October 30, 2008, the trial court entered a judgment holding that the action is not governed by La.R.S. 9:2800.51, the Louisiana Products Liability Act (LPLA), but is governed by pre-LPLA strict liability law. Defendant did not seek review of that ruling. On December 11, 2008, the trial court ordered Plaintiffs to amend their petitions to address issues of standing. Plaintiffs filed supplemental and amended petitions. On February 9, 2009, the trial court rendered a partial summary judgment dismissing Plaintiffs' claims that allege "defective construction or composition" and "defective design as to product formulation and composition." These rulings are not at issue.

On July 6, 2009, the trial court rendered a judgment certified as a final judgment under La.Code Civ.P. art 1915(B). The trial court ruled on nine motions and exceptions filed by Plaintiffs and Defendant. The trial court granted Defendant's exceptions of no right of action and no cause of action as to twenty-one of the named Plaintiffs in the consolidated cases but denied the exceptions as to three Plaintiffs, namely Charles Broussard, Mary Olive Broussard Chappuis and Flying J. Ranch Lands, Inc. The trial court found the twenty-one dismissed Plaintiffs had no standing to proceed and their claims were prescribed on the basis that: (1) Louisiana's survival action statute, La.Civ. Code art. 2315.1, applies to Plaintiffs' property damage claims and therefore such claims are subject to a one year "preemptive" period from the date of death of the person who owned the property at the time of the alleged contamination; (2) no cause of action is created by the provisions of La.R.S. 30:2015.1 and there is therefore no cause of action for ground water remediation; (3) the utility of Defendant's product, Cooper's Cattle Dip, outweighed its danger-in-fact and it was therefore not dangerous per se; and (4) there is no evidence that arsenic levels have

2

been found in any of the drinking water, no evidence that any of the Plaintiffs have suffered any adverse health problems as a result of high levels of arsenic in the drinking water, and no evidence of damage to the Chicot aquifer. The trial court also denied Plaintiffs' motion for summary judgment asserting Cooper's Cattle Dip was dangerous per se and granted Defendant's motion for summary judgment asserting the product was not dangerous per se. Plaintiffs filed this devolutive appeal.

## LEGAL ANALYSIS

We review district courts' rulings on exceptions of no cause of action de novo. *Fakier v. State of Louisiana, Bd. of Suprvrs. Univ. of La. Sys.*, 08-111 (La. App.3 Cir. 5/28/08), 983 So.2d 1024. *See also Scheffler v. Adams and Reese, LLP*, 06-1774 (La.2/22/07), 950 So.2d 64. Likewise, we review exceptions of no right of action de novo, *Joseph v. Hosp. Serv. Dist. No.2 of the Parish of St. Mary*, 05-2364 (La.10/15/06), 939 So.2d 1206, as well as motions for summary judgment, *see Champagne v. Ward*, 03-3211 (La.1/19/05), 893 So.2d 773.

Plaintiffs in both actions allege they have sustained injury, and continue to sustain injury, to their person and property as a result of alleged ground water contamination caused by Cooper's Cattle Dip, manufactured by Defendant's predecessor. Plaintiffs' allege the contamination pre-dates the 1988 passage of La.R.S. 9:2088.51. Defendant does not dispute this allegation and did not appeal the trial court's ruling on the application of products liability law prior to 1988. We agree that these consolidated cases must be examined under Louisiana's strict liability law as it existed prior to the enactment of La.R.S. 9:2088.1 in 1988.

### Products Liability

The Louisiana Supreme Court set forth the fundamentals of early Louisiana products liability law in *Weber v. Fidelity & Casualty Ins. Co.*, 250 So.2d 754, 755

(La. 1971), a case which also involved Cooper's Cattle Dip (emphasis added):

> A manufacturer of a product which involves a risk of injury to the user *is liable to any person, whether the purchaser or a third person*, who without fault on his part, sustains an injury caused by a defect in the design, composition, or manufacture of the article, if the injury might reasonably have been anticipated.

Plaintiffs allege in their petitions, and have presented evidence at the hearings on the motions for summary judgment, that arsenic-laden cattle dip was used in large vats on or adjacent to all of the Plaintiffs' lands. Defendant presents no evidence to the contrary. The method used to "dip" the cattle entailed passing the cattle through large vats filled with a solution of Cooper's Cattle Dip containing high concentrations of arsenic and other poisonous chemicals. The cattle would then be left standing around in closed pens, on the open ground near the vats, dripping poisonous dip directly onto the ground until they dried sufficiently to be released to pasture. Plaintiffs introduced evidence demonstrating there were no instructions from the manufacturer as to how to cleanup these areas where the dip was simply allowed to run-off onto the ground, allegedly contaminating the soil and eventually the water in the area. Defendant did not introduce any evidence nor present any argument asserting that any such warnings or instructions were given to users of this poisonous and hazardous product. Neither did Defendant allege that its predecessor provided warnings or methods to safely dispose of the used cattle dip to avoid contamination of the soil and ground water. Plaintiffs submitted evidence in the form of copies of the labels accompanying the product which clearly demonstrate the absence of any such warnings.

No one disputes that the arsenic-laden cattle dip was a toxic, hazardous substance designed to kill and known to be highly toxic, even deadly, to humans and animals. As the Louisiana Supreme Court noted in *Weber*, "The defendant

4

manufacturer's dip is shown to be an inherently dangerous and deadly product due to its arsenic content." 250 So.2d at 756. In that case, the court found that the particular batch which caused plaintiffs' injuries and losses was a defective batch and therefore found it was unreasonably dangerous per se. The court in *Weber* did not reach the question of whether Cooper's Cattle Dip, when properly manufactured, was dangerous per se. It did, however, determine that the product is "an inherently dangerous and deadly" product. Plaintiffs' expert testified in his affidavit that Cooper's Cattle Dip is a deadly poison and is an inherently dangerous product even when properly manufactured.

The Louisiana Supreme Court in *Halphen v. Johns-Manville Sales Corp*., 484 So.2d 110, 116-17 (La. 1986) explained strict products liability in Louisiana:

> The principle of strict products liability is analogous to the principles of legal fault or strict liability underlying civil code articles 2317-22. The manufacturer who places an unreasonably dangerous product on the market that causes injury to innocent victims is subject to strict liability even if he has not been guilty of any negligence. The liability arises from his legal relationship to the product and is based on the product's unreasonably dangerous condition. One of the reasons for strict products liability is similar to that underlying the codal strict liability: The person to whom society allots the supervision, care, or guardianship (custody) of the risk-creating thing bears the loss resulting from creation of the risk, rather than some innocent third person harmed as a consequence of its defective condition.

Plaintiffs presented evidence that the product was sold without sufficient warning about its inherently dangerous nature or recommendation to safely dispose of it. However, it specifically mentioned on its label that the product becomes concentrated when left in the vat as a result of water evaporation which made it even more deadly. Additionally, the manufacturer directed the user to dispose of the container in which the product was sold by making holes in the can, rinsing it out with water, and then burying the can. This direction itself created a possible avenue for contamination rather than providing a safe means of disposal. Defendant does not

5

assert that the manufacturer was unaware of the dangers posed by its product. In fact, the manufacturer's literature regarding the product mentions the possibility of contaminating ground water but offers no instruction on any means or method of safe disposal or means to neutralize the poison. Plaintiffs, however, introduced evidence from written materials circulated in the industry at the time this product was in use, which demonstrate that the danger of harm to humans through contamination of drinking water was well known and that there were methods of disposal known by others in the industry to safely dispose of the dip in a manner which would render it less harmful.

Plaintiffs alleging injury as a result of a defective product have "the burden of proving that the product was defective, i.e., unreasonably dangerous to normal use, and that the plaintiff's injuries were caused by reason of the defect." *Weber*, 250 So.2d at 755. However:

> If the product is proven defective by reason of its hazard to normal use, the plaintiff need not prove any particular negligence by the maker in its manufacture or processing; for the manufacturer is presumed to know of the vices in the things he makes, whether or not he has actual knowledge of them.

250 So.2d at 756.

The Louisiana Supreme Court later discussed in detail the major tenants of Louisiana products liability law in *Halphen,* 484 So.2d at 113 (La. 1986) (emphasis added):

> In order to recover from a manufacturer, the plaintiff must prove that the harm resulted from the condition of the product, that the condition made the product unreasonably dangerous to normal use, and that the condition existed at the time the product left the manufacturer's control. The plaintiff need not prove negligence by the maker in its manufacture or processing, since the manufacturer may be liable even though it exercised all possible care in the preparation and sale of its product. *Bell v. Jet Wheel Blast*,462 So.2d 166 (La. 1985); *Hebert v. Brazzel*, 403 So.2d 1242 (La. 1981); *DeBattista v. Argonaut-Southwest Ins. Co.*, 403 So.2d 26 (La. 1978); *Weber v. Fidelity & Casualty Ins. Co.*

6

*of New York,*259 La. 599, 250 So.2d 754 (1971).

As strict products liability in tort was originally conceived, the manufacturer's ability to know of the danger of its product at the time of sale was immaterial. Under pure strict liability theory, the product is on trial, not the knowledge or conduct of the manufacturer. Subsequently, additional products liability theories developed which *permit the plaintiff to recover when the manufacturer fails to give adequate warning* or adopt an alternate design to make the product safer. Under these later theories, the knowledge available to the manufacturer when it designs, manufactures, and markets the product may be material. Accordingly, whether the knowledge of the danger in a product is material, relevant, or admissible depends on the particular theory of recovery under which the plaintiff tries his case.

An essential element of a plaintiff's case under each strict liability theory of recovery is proof that the defendant's product was unreasonably dangerous to normal use. The method of proof of this element varies under each theory, however, and this is why the knowledge available to the manufacturer is material only with regard to certain theories.

The Louisiana Supreme Court acknowledged that products which are "unreasonably dangerous per se" are a separate class of defective products, the purest form of strict liability. *484 So.2d* at 114. The court explained that "A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product." *Id.* This theory, the court explained, is based on consideration of the product's "danger-in-fact" and not on whether the manufacturer knew or should have known of the danger. The purpose of that classification is to "evaluate the product itself, not the manufacturer's conduct." *Id.* This came to be known as the risk-utility test. The trial court relied upon this test in reaching its determination that Cooper's Cattle Dip is not unreasonably dangerous per se. We find the trial court acted prematurely in reaching this decision as the record reveals there are genuine issues of material fact in dispute regarding whether the danger-in-fact outweighed the utility of this product. We further find, for reasons stated below, the trial court erred as a matter of law in its application of the risk-utility test.

7

As the Louisiana Supreme Court hastened to point out in *Halphen*:

> Although a product is not unreasonably dangerous per se or flawed by a construction defect, *it may still be an unreasonably dangerous product if the manufacturer fails to adequately warn about the danger related to the way the product is designed. A manufacturer is required to provide an adequate warning of any danger inherent in the normal use of its product* which is not within the knowledge of or obvious to the ordinary user. *Winterrowd v. The travelers IndemnityCo.*, 462 So.2d 639 (La. 1985); *Hebert v. Brazzel*, 403 So.2d 1242 (La. 1981); *Chappuis v. Sears Roebuck & Co.*, 358 So.2d 926 (La. 1978); cf. *Rey v. Cuccia*, 298 So.2d 840 (La. 1974). In performing this duty a manufacturer is held to the knowledge and skill of an expert. It must keep abreast of scientific knowledge, discoveries, and advances and is presumed to know what is imparted thereby. [ ] Under the failure to warn theory evidence as to the knowledge and skill of an expert may be admissible in determining whether the manufacturer breached its duty.
> (Emphasis added).

484 So.2d at 114-15.

It is not enough to simply conclude, as the trial court did, that because Defendant put forth evidence that shows the dip effectively eradicated ticks it has shown the utility outweighed the danger-in-fact. Plaintiffs countered by placing substantial evidence in the record which demonstrates that the danger-in-fact was great. The trial judge concludes that just because a few landowners may have suffered injury because of the use of this product it was not a price too high to pay for the resulting eradication of ticks and the benefit of that to the general public. But this is not a full and proper analysis of the risk-utility test. As the Supreme Court further explained in *Halphen*:

> A product is unreasonably dangerous per se if a reasonable person would conclude that the danger-in-fact of the product, whether foreseeable or not, outweighs the utility of the product. [citations omitted]. This theory considers the products danger-in-fact, not whether the manufacturer perceived or could have perceived the danger, because the theory's purpose is to evaluate the product itself, not the manufacturer's conduct. Likewise, the benefits are those actually found to flow from the use of the product, rather than as perceived at the time the product was designed and marketed. [ ] A warning or other feature actually incorporated in the product when it leaves the manufacturer's control, however, may reduce the danger-in-fact.

484 So.2d at 114.

In this case, the *failure to include warnings* about disposal of the dip solution, the great potential for contamination of the soil and ground water and the effects of such contamination, and information on how to decontaminate land upon which the arsenic dip necessarily fell, seriously increased the danger-in-fact which already existed in this toxic product. The failure to warn weighs heavy in the risk-utility test. It is apparent the trial judge did not consider this factor in concluding that this product was not unreasonably dangerous per se.

As the Louisiana Supreme Court in *DeBattista v. Argonaut-Southwest Ins. Co.*, 403 So.2d 26, 30 (La. 1981) stated " '[u]nreasonably dangerous' means simply that the article which injured the plaintiff was dangerous to an extent beyond that which would be contemplated by an ordinary consumer." The record reveals many facts supporting the conclusion that genuine issues of material fact sufficient to defeat summary judgment exist. There were no instructions for safe disposal of the dip made with the product and no instructions on how to decontaminate the land saturated by the product outside the dipping vats where cattle were placed to dry after dipping. The process of keeping the cattle penned up after dipping before being released to pasture was in accordance with the manufacturer's instructions. The manufacturer's instructions explained that this was necessary to avoid injury to the cattle. The manufacturer failed to provide warnings and instructions despite warning consumers that evaporation of the water mixed with the concentrated arsenic solution made the product an even more potent toxic poison.

Our courts have held that even though a product may have a utility that outweighs its danger, *it may still be unreasonably dangerous and subject to strict liability*, as in the case of the danger of escalators to children.

9

> If the dangers are unavoidable, one is compelled to the question posed in *Reynolds*, supra: should infants be allowed to ride on escalators? The inescapable conclusion is that escalators, for all their utility, are unreasonably dangerous to small children. If escalators cannot be made reasonably safe for escorted children, children should be warned against riding them. Stores and manufacturers *who do not warn* against children riding escalators are strictly liable for any resulting injuries. [ ] Although not unreasonably dangerous "per se", escalators are unreasonably dangerous to small children, making their manufacturers and custodians strictly liable for escalator injuries to those children. LSA-C.C. art. 231. There is no question that the injury here was foreseeable, which would also make the manufacturer liable under *Weber*, supra. (emphasis added)

*Brown v. Sears, Roebuck and Co.*, 514 So.2d 439, 445-46 (La. 1987).

Similarly, in another failure to warn case, the Louisiana Supreme Court found an ordinary hammer, though certainly not unreasonably dangerous per se, was "unreasonably dangerous to normal use" when placed on the market without a sufficient warning informing the consumer that if the hammer gets chipped during use it must be discarded immediately. *Chappuis v. Sears*, 358 So.2d 926 (La. 1978). More to the point, we are satisfied Plaintiffs did put forth sufficient evidence to demonstrate there are genuine issues of fact in dispute in determining the risk versus the utility of the product and in assessing whether this product was dangerous per se. The trial court's ruling in this regard was clearly legal error. Moreover, for all the utility the cattle dip may have offered by way of eradicating ticks carrying dangerous diseases, a reasonable factfinder might very well conclude the arsenic laden dip was unreasonably dangerous especially when used without proper warnings.

***Exception of No Cause of Action***

The peremptory exception of no cause of action raises a question of law based solely on the sufficiency of Plaintiffs' petition. In considering whether to grant or deny the exception the trial court must accept every well-pleaded fact in the petition as true. In *Badeaux v. Southwest Computer Bureau, Inc.*, 05-612, 05-719, p. 6 (La.3/17/06), 929 So.2d 1211, 1216-17, the Louisiana Supreme Court stated "the focus

in an exception of no cause of action is on whether the law provides a remedy against the particular defendant." The inquiry is whether "the law extends a remedy against the defendant to anyone under the factual allegations of the petition." 929 So.2d. at 1217. Plaintiffs allege they have suffered injury as a result of ground water contamination and as a result of drinking arsenic-contaminated water for many years without knowing of the presence of such high levels of arsenic. These allegations are sufficient to state a cause of action and a right of action against the Defendant manufacturer, and perhaps against the custodian of its product. The failure to remove contaminants create an ongoing and damaging nuisance to Plaintiff property owners. Such failure to act to correct the problem is "tortious conduct." *See Risin v. D.N.C. Investments, L.L.C.*, 05-0415 (La. App. 4 Cir.12/7/05), 921 So.2d 133, *writ denied*, 06-0041 (La.4/17/06), 926 So.2d 519. Defendant does not deny that it is the successor to the manufacturer of Cooper's Cattle Dip. Neither does Defendant deny that Cooper's Cattle Dip was used in various dipping vats on or near all of the Plaintiffs' properties in Vermilion Parish. In fact, Defendant explains the history of cattle dipping, and the use of Cooper's Cattle Dip nationwide and in Vermilion Parish, Louisiana in its brief to this court. The petitions sufficiently set forth allegations which if true, establish Plaintiffs, and anyone similarly situated, in both suits, will be entitled to remedies against Defendant for contamination of Plaintiffs' lands and ground water, and the effect this contamination has had or is likely to have on Plaintiffs' health. The trial court erred as a matter of law in granting Defendant's exception of no cause of action.

***Exception of No Right of Action***

The trial court also erred in granting Defendant's exception of no right of action.

> An exception of no right of action is a threshold procedural device used to terminate a suit brought by a person who has no legally

11

recognized right to enforce the right asserted. Unless otherwise provided by law, an action can only be brought by a person having a real and actual interest in the matter asserted. LSA-C.C.P. art. 681. An exception of no right of action is a peremptory exception designed to test whether plaintiff has a real and actual interest in the action. LSA-C.C.P. art. 927(A)(5). The function of the exception is to determine whether plaintiff belongs to the class of persons to whom the law grants the cause of action asserted. *Industrial Companies, Inc. v. Durbin*, 02-0665, p. 11 (LA.1/28/03), 837 So.2d 1207, 1216; *Louisiana Riverboat Gaming Commission*, 94-2015, p. 4 (La.11/30/94), 646 So.2d 885, 888. Evidence is admissible on the trial of the exception of no right of action to support or controvert any of the objections pleaded. LSA-C.C.P. art. 931.

*Joseph v. Hosp. Serv. Dist. No.2 of the Parish of St. Mary*, 05-2364, p. 5 (La.10/15/06), 939 So.2d 1206, 1210.

Plaintiffs offered sufficient evidence at the hearings on the motions for summary judgment to state a right of action for damages under products liability law based on the product being unreasonably dangerous and the manufacturer's failure to warn. Plaintiffs in these consolidated cases have the ultimate burden of proving if and to what extent they have been damaged by Defendant's product. Our review of the record also convinces us the trial court erred in finding Plaintiffs have not been harmed and that there is no evidence of ground water contamination in the area. Plaintiffs presented evidence in the record establishing ground water contamination in their community through the presence of high levels of arsenic in amounts as much as eighty times the amount considered a safe level by the EPA and Louisiana Department of Environmental Quality (DEQ). The record further reveals expert evidence that high levels of arsenic in drinking water can increase the likelihood that persons who drink contaminated water have a higher probability of developing certain types of cancer. It is true Plaintiffs ultimately bear the burden of proving that the high concentrations of arsenic in their groundwater, used for drinking and other purposes, came from Cooper's Cattle Dip. The evidence in the record at this stage of the proceedings is certainly sufficient to show arsenic in fact has entered the community

12

water system and may be causing serious health problems for the residents.

Additionally, we find the trial court erred as a matter of law in dismissing Plaintiffs' claims based on rules of property law. The decisions relied on by the trial court in this regard are not applicable to product liability cases. The Louisiana Supreme Court held in *DeBattista,* 403 So.2d. at 32, "rules defining and governing warranties that were developed to meet the needs of commercial transactions cannot properly be invoked to supersede Civil Code Article 2315 which serves the much broader purpose of governing the liability of a manufacturer or processor to those injured by his defective products." The Louisiana Supreme Court concluded in *DeBattista*, that although blood used for transfusion is not unreasonably dangerous per se, blood used for transfusions which is tainted with the hepatitis virus is defective and is unreasonably dangerous to normal use. This is so because the risks in receiving the tainted blood are clearly greater than a reasonable consumer would expect. As the court explained, "a 'defective condition' is one 'not contemplated by the ultimate consumer, which will be unreasonably dangerous to him.' Restatement (Second) Torts, s 402A comment g." 403 So.2d at 31. As the court further explained in *DeBattista,* 403 So.2d at 31 (emphasis added):

> We recognize that the words 'unreasonably dangerous' may serve the beneficial purpose of preventing the manufacturer from being treated as the insurer of its products. We conclude, however, that the term may be used only for this purpose, and *certainly not to burden the injured plaintiff with proof of an element which rings of negligence.* Otherwise, the formulation of strict liability in practice would rarely lead to a different conclusion than would have been reached under the laws of negligence. *Cronin v. J.B.E. Olson, Corp., supra*, 104 Cal. Rptr. At 442, 501 P.2d at 1162. *See, Comment*, 40 La.L.Rev. 207 (1979). *Yet the very purpose of strict liability is to relieve the plaintiff from problems of proof inherent in pursuing negligence and warranty remedies, and thereby to insure that the costs of injuries resulting from the defective things are borne by those responsible for them. See Loescher v. Parr*, supra. at 446.

> .

13

Succinctly put, under our jurisprudence as it existed prior to 1988, "strict liability results from the conduct or defect of a person or thing which creates an 'unreasonable risk' of harm to others. *Loescher v. Parr*, supra." 403 So.2d at 30. Strict liability for injury suffered as the result of an unreasonably dangerous product attaches to a claim by *any person* injured by such product. *See Weber*, 250 So.2d at 755 and *Halphen*, 484 So.2d at 116-117. There is no requirement that an injured person have an ownership interest in the land contaminated by arsenic. "Any person" injured by the contaminated water or soil has a right of recovery and has standing to enforce that right.

> The underlying principle is provided by Article 2315: 'Every act whatever of man that causes damage to another obliges him by whose fault it happened to repair it.*** 'The remaining articles constitute amplifications as to what constitutes 'fault' and under what circumstances a defendant may be held liable for his act or that of a person or thing for which he is responsible. *Loescher v. Parr*, 324 So.2d 441 (La. 1975).

*DeBattista,* 403 So.2d at 29.

Recognizing the long-held, fundamental principle in Louisiana that "reparation must be made to him who suffered injury", *Eagle Pipe and Supply, Inc. v. Amerada Hess Corp.*, 09-298, p. 4 (---So.3d---) 2010 WL 3505096 (La.App. 4 Cir. 9/8/10)*,* citing *Clark v. Warner*, 6 La.Ann. 408, 408 (La. 1851), the fourth circuit aptly stated:

> The injury is not dispelled by a subsequent purchase, and therefore we see no reason why the right to seek remedy for it should be. The injured party should not be precluded from seeking reparation merely because the damage remained hidden long enough for the property to be sold. In such cases, injury is deemed to occur when the damage is, or should have been discovered. (citations omitted).

Defendant in this case argues, and the trial court reasoned, that Plaintiffs have no standing to bring this action because they did not own the property when the original contamination occurred and because none of the plaintiffs acquired the right to pursue recovery for such damage from the previous landowners. This is a

misapprehension of the law. We find Plaintiffs do have standing to assert their claims under Louisiana products liability law based on their allegations that they have been injured as a result of exposure to high levels of arsenic in the ground water they have ingested for many years. Defendant's reliance on this court's holding in *Lejuene Bros., Inc. v. Goodrich Petroleum Co. LLC*, (La.App. 3 Cir. 11/28/07), 981 So.2d 23, *writ denied*, 08-298(La. 4/4/08), 978 So. 2d 327, is misplaced. We expressly stated in *LeJuene,* that the only issue which remained to be decided in that case was "whether LeJuene Brothers' *contract claim* is supported by the facts of this case and Louisiana law." 981 So.2d at 25. (emphasis added). We held in *LeJuene* that the facts demonstrated Plaintiff had not acquired any right to sue pursuant to a pre-existing lease which was terminated prior to the purchase. We further stated the specific issue remaining was "whether Plaintiff acquired the right to sue, pursuant to the Baez Lease, by virtue of a stipulation *pour auturi*." 981 So.2d at 25-26. We held Plaintiff was not a third party beneficiary under the Baez Lease and could not acquire any rights as an assignee under an expired mineral lease. In addressing the exception of no right of action in *LeJuene* we further held "a claim for damages, whether it arises under a predial lease or a mineral lease, is a personal right which must be specifically assigned to run with the property." 981 So.2d at 32. We expressly noted in *LeJuene* that La.R.S. 30:2015.1 "applies to the rights of a landowner to collect money for damages to *usable ground water*" and that Plaintiffs in *LeJuene* specifically denied they were making any claim under this statute. 981 So.2d at 35. The Plaintiffs in *LeJuene* stated "[T]he provisions of La.R.S. 30:2015.1 do not apply to this action." *Id*. We therefore rejected the plaintiffs' attempt on appeal in *LeJuene* to raise that issue. The Plaintiffs in the present action, however, assert they have a right to claim damages for ground water contamination. The trial court erred as a matter of law in concluding that

15

Plaintiffs do not have such a claim.

Recently, in *Eagle Pipe*, 09-298 at p. 2, our sister circuit court of appeal, on rehearing before a five-judge panel, had occasion to consider a similar legal question. That court noted:

> The trial court decided as a matter of law that Eagle Pipe possessed no right of action for contamination of its property because the contamination occurred under a lease prior to purchase, and thus created a personal (as opposed to real) right that the former owners did not expressly assign to Eagle Pipe. The trial court concluded that, because Eagle Pipe did not acquire an expressed subrogation of its vendors' rights against their lessee, Union Pipe, it had no right of action.

The fourth circuit, on rehearing, reversed the trial court's finding. The trial court based its ruling on its interpretation of the holding in *Prados v. South Central Bell Telephone Company*, 329 So.2d 744 (La. 1975) and *St. Jude Med. Office Bldg. Ltd. P'ship v. City Glass and Mirror, Inc.*, 619 So.2d 529, 530 (La. 1993). The trial court and the exceptors in Eagle Pipe relied on the rule enunciated in this line of cases which they maintained "comprehensively provide that 'a purchaser cannot recover from a third party for damage to the property incurred prior to sale.'" *Eagle Pipe*, 09-298 at p. 2, citing *Prados v. South Central Bell Telephone Company*, 329 So.2d 744 (La. 1975) (on rehearing). This is the argument artfully advanced by Defendant in the case before us and relied upon by the trial court. The fourth circuit's analysis in reaching its decision on rehearing is instructive in the present matter and is in complete accord with our analysis in the present case.

> While there is no question that Eagle Pipe's vendors were the lessors of Union Pipe before the sale, and that Union Pipe's lease terminated prior to the sale, Eagle Pipe's claims against the oil companies and transporters do not arise from Union Pipe's activities as a lessee *qua* lessee.(*FN 10* – If Eagle Pipe's cause of action was against Union Pipe for breach of its lease obligations, which had terminated prior to Eagle Pipe's purchase of the property, *Prados* may well be controlling). The explicit holding of *Prados* on rehearing is 'that the present owner has no right to recover damages against the former lessee.' *Prados*, 329 So.2d at 751 (emphasis supplied). But *Prados*, like *LeJuene Bros., Inc. v.*

16

*Goodrich Petroleum Co., L.L.C.*, 06-1557 (La.App. 3 Cir. 11/28/07), 981 So.2d 23, 'involve [ ] rights arising under a lease and [are] distinguishable from the instant facts.' *Hopewell, Inc. v. Mobil Oil Company*, 00-3280 (La. 2/9/01), 784 So.2d 653, 653 (per curiam). In *Hopewell* the purchaser contended that, through oil and gas operations, hazardous and toxic wastes were deposited in the ground and asserted that the oil company had a duty to restore the property, which duty extended to subsequent landowners. See *Hopewell, Inc. v. Mobil Oil Company*, 33,774 (La.App.2 Cir. 11/1/00), 770 So.2d 874,876. The second circuit concluded that *Prados* requires sustaining the exception of no right of action. But the Louisiana Supreme Court, rejecting that authority and reasoning, reversed the second circuit and reinstated the trial court's ruling denying the exception of no right of action.

We understand the Supreme Court's decision in *Hopewell* to make this same important distinction which we now make: that *Prados* is limited to actions by a subsequent purchaser against a former lessee arising out of the terminated lease. Notably, the cases cited by the defendants to support the application of this rule relied upon by the trial court all involve causes of action arising under leases.

Moreover, the decision in *Prados* relied upon the rule that 'a buyer is presumed to know the overt condition of the property and to take that condition into account in agreeing to the sale price.' *Prados*, 329 So.2d at 751. This is a sound rule, but one not applicable to the facts of this case. [ ]

While the rule of law announced in *Prados* is a sound rule, it is limited to its dispositive facts and we, therefore, conclude that *Prados* is not controlling in this case which does not involve a lease and does not involve an overt condition of property.

*Eagle Pipe*, 09-298 at pp. 3-4.

Likewise in this case, our decision in *LeJuene*, expressly was limited to the issue presented therein, and it is not applicable to the product liability claims asserted by the Plaintiffs in this case. Defense counsel has skillfully used the language in *LeJuene* and similar cases but he has missed the mark.

**Prescription**

In *Hazelwood Farms, Inc. v. Liberty Oil and Gas Corp.*, 02-266, p. 12 (La.App. 3 Cir.4/2/03), 844 So.2d 380, 389, we held:

Damage is sustained, within the meaning of prescription, only when it has manifested itself with sufficient certainty to support the

accrual of a cause of action. *Cole v. Celotex Corporation*, 620 So.2d 1154 (La. 1993). The damages suffered must at least be actual and appreciable in quality. Where a claimant has suffered some but not all damages, prescription runs from the day on which he suffered actual and appreciable damages even though he may thereafter realize more precise damages. *Harvey v. Dixie Graphics, Inc.*, 593 So.2d 351 (La. 1992). However, prescription will not commence at the earliest possible indication that plaintiff may have suffered some wrong. It will begin to run when plaintiff has a reasonable basis to pursue a claim against a specific defendant. *Jordan v. Employee Transfer Corproation*, 509 So.2d 420 (La. 1987). Prescription should not be used to force a potential plaintiff who believes that he may have a cause of action to rush to the courthouse to file suit against all parties that may have caused the damage. *Miley v. Consolidated Gravity Drainage District No. 1*, 93-1321 (La. App. 1st Cir.9/12/94); 642 So.2d 693.

*Labbe Serv. Garage, Inc. v. LBM Distrib., Inc.*, 94-1043, p. 11 (La.App. 3 Cir.2/1/95), 650 So.2d 824,829.

The trial court's error was compounded when it determined the issue of prescription in this case. In holding that Plaintiffs' claims are governed solely by Louisiana property law, the trial court found, to avoid prescription, Plaintiffs had to be owners of the affected property at the time of the contamination of the ground water or they had to acquire the landowner's right of action in the transfer of the property. The trial court also based its ruling on prescription as to some of the Plaintiffs on the provisions of La.Civ. Code art. 2315.1, survival actions. As we have concluded, the trial court's reliance on Louisiana property law was erroneous. Plaintiffs have properly alleged sufficient facts to state claims under Louisiana products liability law as the law on the subject stood prior to 1988. Until the expert rendered his opinion that the ground water was contaminated with high levels of arsenic and that this could be the cause of the high incidence of certain types of cancer in the area affected by the contamination, Plaintiffs were not aware of the injury they may have suffered or of the affects the contamination of their soil and groundwater may have upon them and their children in the future. In other words, until that time the damage had not "manifested

itself with sufficient certainty to support the accrual of a cause of action." *Id.* Likewise, until Plaintiffs realized that cattle dip used prior to 1970 is the likely cause of the arsenic contamination, they could not have had a reasonable basis "to pursue a claim against a specific defendant." *Id.*

Father William Ragallo, the local parish priest, was the first to have a water well in the affected area tested after his diagnosis of cancer in 2004. His inquiry lead to investigations by the Louisiana Department of Environmental Quality and the Louisiana Department of Health. This lead to the discovery that the drinking water in the local wells on Plaintiffs' lands are contaminated with as much as eighty times the acceptable levels of this toxic chemical. The first Petition For Damages was filed on November 8, 2004 by Del Dean and Paul Ronald Dale David. The Third Supplemental and Amended Petition For Damages was filed July 14, 2005. The Third Amended Petition added twenty-five plaintiffs to the original petition, namely: Connie Langlinais Broussard, John Glynn Broussard, Jude Broussard, The Estate of J. Ray Broussard, Joseph A. Couvillion, William Jude Couvillion, Tina S. Couvillon, Julia A. Couvillon, Todd David, Flying J Ranch Lands, Inc., Joyce M. Harrington, George Harrington, Olga J. Harrington, Brian Hollier, Walton Hollier, Jr., Phillip Lynn Langlinais, Dudley Lemaire, Rayetta B. Meaux, Beverly B. Monseur, Alton Romero, Jr., Bonnie Stelly, Nathan Stelly, Raywood Stelly, Suzette Couvillon Trahan, and David Trahan identified as residents and/or property owners in the Cow Island area of Vermilion Parish, Louisiana. The amended petition alleges that these plaintiffs "have an interest in contaminated property in Cow Island, or have property which is or may become contaminated by the defendants' products. They have used and personally consumed water from the Cow Island area." The trial court dismissed these parties, except for Flying J. Ranch Lands, Inc., because they were not owners of

allegedly affected properties at the time the alleged contamination occurred and did not acquire the previous landowners' right to sue by any specific written authority. As we have discussed herein this reasoning was legal error. The trial court also dismissed certain of the Plaintiffs' claims because they were not brought timely under La.Civ. Code art. 2315.1, survival action. This is not a survival action but is an action based on products liability. The trial court's ruling in this regard is also legal error.

The amended petition does not allege when or how these plaintiffs became aware of the arsenic contamination of the soil and/or drinking water. Plaintiffs again filed a Restated Amended And Supplemental Consolidated Petition For Damages, wherein, the "David plaintiffs" are listed in their individual capacities and in various other legal capacities purportedly representing other parties or entities. Both Mrs. Mary Olive Broussard Chappuis and Mr. Charles Broussard were added in this amended petition. Mrs. Chappuis was added in her individual capacity as a co-owner, and as a legatee, heir, and usufructuary of James Ray Broussard, decedent. Mr. Charles Broussard was added as the agent for Flying J. Ranch, Lands, Inc. The trial court's ruling on prescription did not lead to a dismissal of Mary Chappuis' claims because the trial court found her claims were not perempted under La.Civ. Code art. 2315.1. That ruling is not at issue. The court deferred ruling on the exception of prescription as to Charles Broussard and that ruling is not at issue. The trial court did not rule on Defendant's exception of prescription as to Edward and Susan Wilhelm because the trial court found the exception was moot in light of its dismissal based on Defendant's exceptions of no right of action and no cause of action.

Under our de novo review of the consolidated cases on the question of prescription we find the trial court erred in applying precepts of Louisiana property law and in applying the provisions of La.Civ Code art. 2315.1 as the basis to find

20

some of the Plaintiffs' claims are prescribed. There remain many issues of fact in dispute as to whether the addition of the later added plaintiffs relate back to the original petition and whether any of the Plaintiffs' claims have prescribed under appropriate provisions of law. These questions are not before us and we make no finding in those regards. The case is remanded to the trial court with instructions to reinstate all dismissed Plaintiffs in the consolidated cases and to proceed in accordance with the law. The trial court's grant of summary judgment in favor of Defendant finding Cooper's Cattle Dip was not dangerous per se is reversed. All costs of this appeal are assessed against Defendant.

**REVERSED AND REMANDED**

DEL DEAN DAVID, ET UX.

VERSUS

VELSICOL CHEMICAL CORPORATION

AND

WILHELM

VERSUS

MOSAIC GLOBAL OPERATIONS

**PICKETT, J., dissenting in part and concurring in part.**

The majority determines that the plaintiffs have stated a cause of action against GSK. I would not reach this issue as to the twenty-one plaintiffs dismissed by the trial court, as I would find that these plaintiffs do not have standing to bring the instant action. That is, I believe the trial court correctly sustained the exception of no right of action as to Brian Hollier, Tina Couvillion, Monsour Realty, LLC, John & Gayle Broussard Revocable Trust, Wilhelm Farms, LLC, Paul Ronald Dale David, Del Dean Mouton David, Walton Hollier, Beverly Monsour, Edward Wilhelm, Susan Wilhelm, Rayetta Meaux, Mary Olive Broussard, Josette Hanks, Jamie Charbonnet, Julia A. Couvillion, William Jude Couvillion, Joseph Couvillion, John Glynn Broussard, Philip Lynn Langlinais, and Connie Langlinais Bruoussard. I also agree with the trial court that these plaintiffs do not have a separate cause of action pursuant to 30:2015.1.

The majority believes that the exception of no right of action was improperly sustained because the twenty-one dismissed plaintiffs have proven groundwater

contamination. It eschews the idea that property law should govern a case in which pre-LPLA strict liability for manufacturers of unreasonably dangerous products is at issue. I disagree. If Cooper's Cattle Dip is found to be unreasonably dangerous per se, the harm to the land was caused when the product was used before 1985. A claim for damage to immovable property is a personal action belonging to the owner of the land. The twenty-one dismissed plaintiffs were not the owners of the affected land when the product was used. They cannot prove that the right to bring a personal action held by the owners of the land at the time of the contamination was transferred to them, or that they inherited the right pursuant to La.Civ.Code art. 2315.1 and brought suit within one year. I would affirm the dismissal of the twenty-one plaintiffs, either because they have no right of action or because they failed to bring their cause of action in a timely manner.

For these reasons, I respectfully dissent in part from the majority opinion. In all other respects, I concur in the result.